**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MAXELL, LTD.,<br><br>*Plaintiff*,<br><br>v.<br><br>HISENSE CO., LTD., HISENSE INTERNATIONAL CO. LTD., HISENSE VISUAL TECHNOLOGY CO. LTD. F/K/A QINGDAO HISENSE ELECTRONICS CO., LTD., GUIYANG HISENSE ELECTRONICS CO., LTD., HISENSE INTERNATIONAL (HONG KONG) AMERICA INVESTMENTS, CO., LTD., HISENSE INTERNATIONAL (HK) CO., LTD., HISENSE ELECTRONICA MEXICO S.A. de C.V.,<br><br>*Defendant*. | Civil Action No. ___________<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Maxell, Ltd. ("Maxell"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 for Patent Infringement against Defendants Hisense Co., Ltd., Hisense International Co., Ltd., Hisense Visual Technology Co. Ltd. f/k/a Qingdao Hisense Electronics Co., Ltd., Guiyang Hisense Electronics Co., Ltd., Hisense International (Hong Kong) America Investments Co., Ltd., Hisense International (HK) Co., Ltd., and Hisense Electronica Mexican S.A. de C.V. ("Hisense") and further alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

## OVERVIEW

1. This is an action for patent infringement by Maxell. Founded in 1961 as Maxell Electric Industrial Co., Ltd., Maxell is a leading global manufacturer of information storage media products, including magnetic tapes, optical discs, and battery products such as lithium ion rechargeable micro batteries and alkaline dry batteries, and the company has over 50 years of experience producing industry-leading recordable media and energy products for both the consumer and the professional markets. Maxell is also a leading manufacturer of projectors and lenses and additionally sells various other devices, such as Bluetooth headsets, wireless charging solutions, etc.

2. Maxell has built up an international reputation for excellence and reliability, for pioneering the power supplies and digital recordings for today's mobile and multi-media devices, and leading the electronics industry in the fields of storage media and batteries.

3. Since being one of the first companies to develop alkaline batteries and Blu Ray camcorder discs, Maxell has always assured its customers of industry-leading product innovation and is one of the world's foremost suppliers of memory, power, audio, and video goods. Maxell's well-recognized logo and iconic "blown away" image exemplify the reputation Maxell carefully developed in these markets.



4. As more fully described below, in 2009 Hitachi, Ltd. assigned much of its consumer product-facing intellectual property to its consumer product business division, Hitachi Consumer Electronics Co., Ltd. Then, in 2013, the consumer electronics division of Hitachi Consumer Electronics Co., Ltd. was transferred to Hitachi Maxell, Ltd. This involved assigning the intellectual property including some of the patents in this case, to Hitachi Maxell, Ltd. In 2017, Hitachi Maxell engaged in a reorganization and name change—to Maxell, Ltd.—in an effort to align its intellectual property with the business development, research and development, and licensing efforts of Maxell, including in the mobile and mobile-media device market (Hitachi, Ltd. and Hitachi Consumer Electronics Co., Ltd. are referred to herein collectively as "Hitachi"). In October 2021, Maxell Holdings, Ltd. and Maxell, Ltd. underwent an absorption-type merger and name change. In that merger, Maxell, Ltd. was absorbed by Maxell Holdings, Ltd., including the ownership of some of the patents at issue in this matter and the rights to license agreements covering such patents. Maxell Holdings, Ltd. then changed its name to Maxell, Ltd. Maxell

continues to own all rights to the patents-in-suit, as well as the entire Maxell portfolio initially obtained from Hitachi.

5. Today, Maxell maintains a thriving business in the mobile device market including wireless charging solutions, wireless flash drives, multimedia players, storage devices, and headphones. Maxell also maintains intellectual property related to televisions, computer products, tablets, digital cameras, and mobile phones. As a technology developer and industry leader, and due to its historical and continuous investment in research and development, including in the State of Texas, Maxell owns a portfolio of patents related to such technologies and actively enforces its patents through licensing and/or litigation. Leading television manufacturers have recognized the value of Maxell's intellectual property and have obtained a license from Maxell in the recent past—including many of the television companies well-known to consumers.

6. Maxell is forced to bring this action against Hisense as a result of Hisense's knowing and ongoing infringement of Maxell's patents following the expiration of Hisense's license to the patents it failed to negotiation renewal of in good faith.

**<u>Hisense's Knowledge of Maxell's Patent Portfolio</u>**

7. Since at least 2009, Hisense has been aware of Maxell's patents and had correspondence and interactions with Maxell's licensing agent at the time regarding Hisense's infringement of Maxell's patents. This correspondence included Hisense's representatives being provided with detailed information regarding Maxell's patents, the developed technology, and Hisense's ongoing use of this patented technology. Through this process, Hisense's representatives requested and received detailed explanations regarding Maxell's patents and allegations. Maxell believed that the parties could reach a mutually beneficial solution and to that

end Maxell's licensing agent considered a potential business transaction and continued to answer multiple inquiries from Hisense over the course of several years, including communicating with Hisense in late 2019. Throughout this period, Hisense elected, however, not to enter into an agreement and did not license Maxell's patents. Instead, Hisense continued to make, use, sell and offer for sale Maxell's patented technology without license.

8. Maxell filed suit in this District on November 22, 2019 asserting infringement of eight of Maxell's patents. The parties' joint motion to dismiss that case as a result of settlement was granted on December 11, 2020.

9. On December 31, 2024, the Patent License Agreement between the parties expired.

10. On December 24, 2024, prior to the Agreement's expiration, Maxell sent a renewal notice letter to Hisense. In that letter, Maxell highlighted that since the parties entered into the Agreement, the strength of Maxell's patent portfolio had been further confirmed by several new license agreements and that Maxell's portfolio had continued to grow with additional patents granted by the USPTO. The letter identified 144 patents and patent applications with exemplary claims that Maxell believed would be infringed by Hisense's televisions once the Agreement expired, including numerous product lines such as the UX Series Mini-LED ULED Google TV, U7 Series Mini-LED ULED 4K Google TV, U8 Series Mini-LED ULED 4K Google TV, and dozens of other Hisense television models. Maxell expressly invited Hisense to engage in constructive discussions concerning a renewal of the Agreement.

11. On January 17, 2025, Hisense responded by email, acknowledging receipt of Maxell's letter and stating that "Hisense will seriously consider your suggestion and hopes to work

with Maxell together to find a[n] amicable solution." However, Hisense took no further substantive action toward renewal discussions.

12. On September 16, 2025, having received no further response from Hisense for approximately nine months, Maxell sent a follow-up letter to Hisense. The letter again noted that the Agreement had expired on December 31, 2024, and that Hisense's failure to renew constituted willful and knowing infringement of Maxell's patents. The letter also identified additional patents that had been allowed or issued since the December 2024 letter and that were infringed by Hisense's televisions. Maxell again urged Hisense to seriously consider renewing the Agreement and engage in productive business discussions.

13. On November 25, 2025, having still received no substantive response from Hisense despite 11 months having passed since Hisense's receipt of the December 24, 2024 letter, Maxell sent a further follow-up email proposing a video call to discuss the matter for an amicable resolution. On November 27, 2025, Hisense responded and agreed to a video call. Maxell proposed entering into a Non-Disclosure Agreement prior to the meeting in order to share meeting materials with Hisense.

14. On December 16, 2025, the parties held their first video call meeting. Because the NDA had not yet been concluded due to scheduling issues on the Hisense side, the parties were unable to share confidential materials during the meeting and instead exchanged general requests and positions. Hisense stated that since Maxell's patent portfolio had changed compared to five years prior, Hisense would like to understand the current value of the portfolio, including a list of representative patents and technical explanations, as well as information regarding conditions of Maxell's existing licenses. Maxell emphasized that most patents from the prior agreement were

still alive, that Hisense was still selling products implementing those patents, and that Maxell's existing licensees demonstrated the portfolio had been highly evaluated. The parties agreed to set the next meeting for January 27, 2026.

15. In January 2026, the parties engaged in negotiations over the terms of the NDA and worked to set up the next meeting.

16. On January 28, 2026, the parties executed the NDA.

17. On January 28, 2026, the parties held their second video call meeting. During this meeting, Maxell presented: (1) information about Maxell's TV patent portfolio licensees; (2) an explanation that the portfolio had a higher value than what was concluded in the previous agreement with Hisense; and (3) a proposed Term Sheet. Maxell also shared a table showing comparable license agreements with other TV makers and OEMs. Hisense opposed the proposed amount and again requested claim charts. Maxell explained that its basic position was not to enter into technical discussions, particularly where here the parties had already engaged in a litigation and resolution resulting in a license agreement. Maxell requested that Hisense provide a counteroffer, but Hisense stated it was difficult to propose a counteroffer at that time. The parties agreed that Hisense would review Maxell's materials and provide feedback in approximately two weeks.

18. On January 29, 2026, Maxell sent to Hisense the materials it had presented during the January 28 meeting, confirming the parties' understanding that Hisense would review the materials and respond in around two weeks.

19. On February 13, 2026, approximately two weeks after the January 28 meeting, Maxell emailed Hisense and shared claim charts via a download link. Maxell noted that Hisense should pay particular attention to the claim charts from the case against TCL, since some TCL products use Google/Android and Roku OS like the new Hisense smart TVs.

20. On February 18, 2026, Maxell responded to Hisense, providing the claim charts again through an alternative method. Maxell noted that despite the strict confidentiality obligations owed to its other licensees, Maxell had been making its best efforts to share related information. Maxell further stated that even though it strongly believed technical discussions were unnecessary—given that Hisense should already understand the value of Maxell's patent portfolio from the names of Maxell's licensees (including Hisense's competitors) and the fact that Hisense itself was Maxell's licensee until the end of 2024—Maxell was nonetheless sharing the claim charts to substantially move the discussion forward. Maxell urged Hisense to prepare a counteroffer.

21. On July 3, 2026 Maxell and Hisense held a meeting. During this meeting, Hisense confirmed that it had finally downloaded the claim charts Maxell provided. However, Hisense noted its plan of wanting to continue technical discussion until September, at which point Hisense would provide its first counteroffer.

22. Maxell continued to communicate with Hisense up until the filing of this complaint but failed to receive any counteroffer or progress in the negotiations suggesting that any sort of resolution could be reached. More than a year and half has passed since the prior license agreement expired and Maxell put Hisense on notice of its continued infringement. Maxell had hoped that the parties could reach a mutually beneficial solution—but Hisense instead insisted on protracted

technical discussions for months and elected not to provide even a first counteroffer or make any attempts to renew the agreement with Maxell.

23. Hisense continues to make, use, sell, and offer for sale Maxell's patented technology without a license. Accordingly, Maxell now files this Complaint.

## PARTIES

24. Plaintiff Maxell, Ltd. is a Japanese corporation with a registered place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

25. On information and belief, Hisense Co., Ltd., is a corporation duly organized and existing under the laws of the People's Republic of China, having an address of Hisense Tower No. 17, Donghai Xi Road, Qingdao, Shandong Province, 266071, P.R. China.

26. Hisense International Co., Ltd. is a corporation duly organized and existing under the laws of the People's Republic of China, with a principal place of business at Hisense Tower, No.17 Donghai Xi Road, Qingdao, Shandong Province, 266071 P.R. China,

27. On information and belief, Hisense Visual Technology Co. Ltd. f/k/a Qingdao Hisense Electric Co., Ltd., is a corporation duly organized and existing under the laws of the People's Republic of China, having an address of No. 218, Qianwangang Road, Economic and Technological Development Zone, Qingdao, Shandong Province, 266555 P.R. China.

28. On information and belief, Guiyang Hisense Electronics Co., Ltd., is a corporation duly organized and existing under the laws of the People's Republic of China, having an address of No. 39, Honghe Road, Economic Technology Development Zone, Guiyang, Guizhou 550006.

29. On information and belief, Hisense International (Hong Kong) America Investment Co., Ltd., is a corporation duly organized and existing under the laws of Hong Kong, having an address of Room 3101-05, Singga Commercial Centre, No. 148 Connaught Road West, Sheung Wan, Hong Kong, which formerly did business under the name Hisense International America Holdings Co., Ltd.

30. Hisense International (HK) Co., Ltd. is a corporation duly organized and existing under the laws of Hong Kong, China, with a principal place of business at Rooms 3101-3105 Singga Commercial Centre, No. 148 Connaught Road West, Hong Kong, China.

31. Hisense Electronica Mexico S.A. de C.V. is a Corporation duly organized and existing under the laws of Mexico, with a principal place of business at Blvd. Sharp 3510 C, Playas de Rosarito, Baja California (MX-BCN), 22706 Mexico.

32. On information and belief, the Defendants identified in paragraphs 25-31 above (collectively, "Hisense") are an interrelated group of companies which together comprise one of the world's largest manufacturers of televisions and one of the leading sellers of televisions in the United States.

33. On information and belief, the Hisense defendants named above are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

34. On information and belief, the Hisense defendants named above share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

35. Maxell brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.

36. This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1338(a) because the action arises under the patent laws of the United States.

37. The Court has personal jurisdiction over the Defendants because (1) Maxell's claims arise in whole or in part from Defendants' conduct in Texas; and (2) Defendants are subject to personal jurisdiction under the provisions of the Texas Long Arm Statute, TX CIV PRAC. & REM CODE §17.041 et seq., by virtue of the fact that, upon information and belief, Defendants have availed itself of the privilege of conducting and soliciting business within this State, including engaging in at least some of the infringing acts alleged herein through the sales and marketing of infringing products in this State. The allegations and claims set forth in this action arise out of Defendants' infringing activities in this State, as well as by others acting as Defendants' agents and/or representatives, such that it would be reasonable for this Court to exercise jurisdiction consistent with the principles underlying the U.S. Constitution, and would not offend traditional notions of fair play and substantial justice.

38. Upon further information and belief, Defendants have also established minimum contacts with this District and regularly transacts and does business within this District, including

advertising, promoting and selling products over the internet, through intermediaries, representatives and/or agents located within this District, that infringe Maxell's patents, which products are then sold, packaged and shipped directly to citizens residing within this State and this District. Upon further information and belief, Defendants have purposefully directed activities at citizens of this State and located within this District.

39. On information and belief, Defendants have purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased and used by customers located in the State of Texas and the Eastern District of Texas. On information and belief, Defendants' customers in the Eastern District of Texas have purchased and used and continue to purchase and use Defendants' products.

40. On information and belief, Defendants have at least a significant role in placing the accused products in the stream of commerce in Texas and elsewhere in the United States. On information and belief, Defendants direct or control the making of the accused products and their shipment to the United States, using established distribution channels, for sale in Texas and elsewhere in the United States. On information and belief, Defendants direct or control the sale of the accused products into established United States distribution channels, including sales to nationwide retailers. On information and belief, Defendants' established United States distribution channels include one or more United States based affiliates. On information and belief, Defendants direct or control the sale of accused products in nationwide retailers such as Best Buy, Target, and Wal-mart, including for sale in Texas and elsewhere in the United States, and expect and intend that the accused products will be so sold.

41. Venue in the Eastern District of Texas is proper as to Defendant Hisense Co., Ltd., which is organized under the laws of China. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

42. Venue in the Eastern District of Texas is proper as to Defendant Hisense International Co., Ltd., which is organized under the laws of China. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

43. Venue in the Eastern District of Texas is proper as to Defendant Hisense Visual Technology Co. Ltd., which is organized under the laws of China. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

44. Venue in the Eastern District of Texas is proper as to Defendant Qingdao Hisense Electronics Co., Ltd., which is organized under the laws of China. Pursuant to 28 U.S.C. §

1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

45. Venue in the Eastern District of Texas is proper as to Defendant Guiyang Hisense Electronics Co., Ltd., which is organized under the laws of China. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

46. Venue in the Eastern District of Texas is proper as to Defendant Hisense International (Hong Kong) America Investments Co., Ltd., which is organized under the laws of Hong Kong. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

47. Venue in the Eastern District of Texas is proper as to Defendant Hisense International (HK) Co., Ltd., which is organized under the laws of Hong Kong. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial

district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

48. Venue in the Eastern District of Texas is proper as to Defendant Hisense Electronica Mexico S.A. de C.V., which is organized under the laws of Mexico. Pursuant to 28 U.S.C. § 1391(c)(3), "a defendant not a resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Therefore, because, among other things, Defendant is not a resident in the United States, they may be sued in any Judicial District pursuant to 28 U.S.C. § 1391(c)(3).

49. Case No. 5:19-cv-00156-RWS was previously brought by Maxell against Defendants in this District.

**COUNT 1 - INFRINGEMENT OF U.S. PATENT NO. 8,107,007**

50. Maxell incorporates paragraphs 1-49 above by reference.

51. U.S. Patent No. 8,107,007 (the "'007 Patent," attached hereto at Exhibit 1) duly issued on January 31, 2012, and is entitled *Image Processing Apparatus.*

52. Maxell is the owner by assignment of the '007 Patent and possesses all rights under the '007 Patent, including the exclusive right to recover for past and future infringement.

53. The ’007 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

54. Like other validity issues, a patent is presumed eligible under 35 U.S.C. § 101 and can only be found ineligible by clear and convincing evidence. The ’007 Patent is patentable under 35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific unconventional components, such that it does not preempt the technological field.

55. The claims of the ’007 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting image processing systems and methods.

56. The ’007 Patent is directed to an image processing apparatus, such as a television, designed to intelligently adjust the frame rate of video content being displayed. ’007 Patent at 1:13-18. This apparatus fundamentally includes an input unit for an image signal with a predetermined frame rate, an information acquirer for obtaining specific details about that input signal (like the amount of motion or the genre of the program), and a frame rate converter. *Id*. at Abstract. The primary role of this unconventional converter is to modify the frame rate of the input image signal dynamically, based on the information gathered by the acquirer, before outputting the signal for display. *Id*.

57. The development of such an apparatus builds on a long-standing understanding within image science. It has been understood for over a century, from early motion studies, that creating more frames to capture a given motion will result in a smoother visual presentation. The "frame rate" itself simply refers to the number of individual frames displayed per unit of time; for instance, a frame rate of 60 hertz (Hz) means that 60 individual frames are shown every second. The '007 Patent focuses on an unconventional arrangement of unconventional components for optimizing this aspect of video display for various content types.

58. The '007 Patent explains that conventional methods of frame rate up-conversion, while capable of making moving pictures appear smoother, are not without significant drawbacks. '007 Patent at 1:24-40. A key issue is that such continuous up-conversion "is not effective in a scene having few motions such as a still picture." *Id*. at 1:30-31. When these older techniques are "conducted regardless of the image state"—that is, without considering whether the image is a dynamic action scene or a static picture—it leads to a situation where "the amount of signal processing that is not effective increases." *Id*. at 1:32-37. This unnecessary processing not only fails to enhance the viewing of low-motion content but also results in increased "power consumption of the apparatus." *Id*. at 1:38-40.

59. The '007 Patent solved these problems by providing "a technique capable of converting the frame rate efficiently." *Id*. at 1:41-42. The innovation lies in the adaptive approach: "In accordance with the present invention, frame rate conversion processing is conducted on an input image signal having a predetermined frame rate on the basis of information concerning the input image signal." *Id*. at 1:43-46. This allows the frame rate to be "changed flexibly according to the image kind (such as the scene or motion amount)," which in turn facilitates an innovative conversion processing and helps to save power. *Id*. at 1:60-63. The information concerning the

image signal may include, for example, a motion in the image, genre information of a program corresponding to the input image signal, or information concerning the signal state of the input image signal, such as the receiving state, the transfer rate or the transmission bit error rate. *Id*. at 1:47-58.

60. Prior to the priority date of the '007 Patent, image processing apparatuses performing frame rate up-conversion did so regardless of the image state, leading to performing ineffective signal processing and increased power consumption. *Id*. at 1:24-40. The asserted claims of the '007 Patent brought an improved solution to these systems by dynamically adjusting the frame rate based on detected motion amount, program genre, or signal state. For example, the frame rate converter conducts a first frame rate conversion processing to generate an output signal having a first frame rate which is higher than the frame rate of the input image signal when the detected motion amount is at least a first predetermined value, and conducts a second frame rate conversion processing to generate an output signal having a second frame rate which is higher than the first frame rate when the motion amount detected is at least a second predetermined value which is greater than the first predetermined value. *Id*. at Claim 1. This results in a dynamic and innovative frame rate conversion that saves power by only performing up-conversion when it would actually benefit the viewing display.

61. The claims of the '007 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow an image processing apparatus to dynamically detect motion amounts in input image signals, acquire genre

information of programs, monitor signal states such as throughput and transmission bit error rates, and adaptively convert frame rates based on this acquired information. '007 Patent at Claims 1-13. These capabilities were not previously available and represent a marked technical improvement to the functionality of image processing systems.

62. The components of the '007 Patent are not generic or conventional. For example, the '007 Patent discloses an input unit, resolution converter, image memory, feature detector serving as an information acquisition unit, frame rate converter (FRC), timing controller, drive frequency changeover unit, motion detector, and display unit such as a PDP or LCD working in coordination to achieve the claimed functionality. *Id*. at 2:63-3:15; Fig. 2; Claims 1-13. The unconventional frame rate converter includes a frame number comparator, motion vector detector, vector adjuster, interpolation frame generator, and memory interface that work together to generate interpolation frames and conduct an unconventional and innovative frame rate conversion. *Id*. at 4:40-5:30; Figs. 4, 5. The claimed components operate in a coordinated architecture in which the information acquisition unit extracts characteristics of the input signal, the frame rate converter generates interpolation frames using motion vectors, and the timing controller drives the display at a rate corresponding to the dynamically determined frame rate. When viewed as a whole, the claimed elements work together in a specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) dynamic detection of motion amount in input image signals using frame-to-frame comparison; (2) adaptive frame rate conversion based on detected motion amount with multiple threshold values; (3) generation of interpolation frames using motion vector detection and vector adjustment; (4) frame rate conversion based on program genre information acquired from EIT data; and (5) frame rate adjustment based on signal state

including throughput and transmission bit error rate. *Id*. at Claims 1-13; 2:63-4:46. This ordered combination reflects a departure from well-understood, routine, and conventional techniques and therefore constitutes an unconventional inventive concept.

63. These features produce specific, tangible technical benefits: flexible frame rate conversion that only up-converts when beneficial to the viewing display, reduced power consumption by lowering drive frequency when displaying still images or low-motion content, optimized viewing for different program genres (sports, movies, and news), and graceful degradation of frame rate when signal quality is poor to alleviate users' frustration brought about by video image freezing. *Id*. at 2:52-54; 9:57-64; 11:14-35. These concrete improvements distinguish the claims from abstract ideas lacking such technological benefits. According to the present invention, the frame rate can be changed flexibly according to the image kind (such as the scene or motion amount) and the frame rate conversion can be conducted dynamically. *Id*. at 1:60-63.

64. The '007 Patent has also been cited 72 times including by Sony Corp. (e.g., JP2013191938A), Canon Inc. (e.g., JP2011227153A), NEC (e.g., JP5882940B2), Panasonic Corp. (e.g., JP2009071809A), Nvidia Corporation (e.g., US8334857B1), Arm Limited (e.g., US9349156B2), Apple Inc. (e.g., US9355585B2), Pixelworks Inc. (e.g., US10230920B1), Samsung Electronics Co. Ltd. (e.g., US11715410B2), Mediatek Inc. (e.g., US9973707B2), and others. The patents (and entities) citing the '007 Patent recognize that the '007 Patent was directed to technical improvement of image processing and frame rate conversion.

65. Defendants directly infringe one or more claims of the '007 Patent in this judicial district and elsewhere in Texas, including at least claim 10 literally and/or under the doctrine of

equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example, products known as the Hisense 55U75QG television.

66. The Hisense 55U75QG is a television with options to accept predetermined frame rate image signals from a variety of sources such as streaming services, game consoles, Blu-ray players, or cable/satellite boxes, through an HDMI, Composite, USB, Ethernet, Wi-Fi (including streaming services such as Amazon Prime), or RF ports (Antenna/Cable).




(Hisense 55U75QG Product Page, available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

**Connectivity**

| Wireless built-in | Bluetooth ® | Ethernet |
|---|---|---|
| Wifi 6E | Yes (5.3) | Yes |

(Hisense 55U75QG Product Page Specifications available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

**Ports**

| HDMI | Ethernet (LAN) | USB | RF antenna |
|---|---|---|---|
| 4 x HDMI 2.1 | Yes | Yes (1 x 3.0, 1 x 2.0) | NTSC/Clear QAM/ATSC 3.0 (NextGen TV) |
| **RCA composite video input** | **L/R audio input for composite** | **Digital audio output** | **Earphone/audio output** |
| Yes (Mini Jack) | Yes | Optical | Yes |

(Hisense 55U75QG - Product Page Specifications available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

| Connectivity Options | |
|---|---|
| HDMI ( 2.1 ) | 4 |
| USB ( 3.0 + 2.0 ) | 2 ( USB 3.0 X 1, USB 2.0 X 1 ) |
| Ethernet / LAN | Yes |
| Bluetooth™ 5.3 | Yes |
| Built-In Bluetooth | Yes |
| Earphone, Audio Output | Yes |
| L / R Audio Input For Composite | Yes |
| Digital Audio Output | Optical |
| Wi-Fi Built In | Wifi 6E |
| RCA Composite Video Input | Mini Jack |
| HDMI-CEC, HDMI-ARC | HDMI-3 eARC |
| RF Antenna | NTSC, Clear QAM, ATSC 3.0 ( NextGen TV ) |

(Hisense 55U75QG Specifications, available at https://mail.fullspecs.net/compare/hisense-55u75qg-vs-hisense-55u68qg/)

67. The Hisense 55U75QG has a Hi-View Engine Pro chipset / processor, including a MediaTek Pentonic 800 (MT9655) System-On-Chip ("SOC") and a ARM Cortex-A73 CPU, that acquires information about the input image signal during a specific picture mode or when certain types of metadata-enabled content is received and displayed by the television. The processor also acquires information about the signal state and genre of the program being displayed.




**AI expert behind every frame**

Hi-View Engine Pro

Enjoy the sports game from home, but feel like you're there. Powered by the Hisense proprietary chipset, Hi-View AI Engine Pro automatically optimizes the picture and sound based on the content you are watching. This intelligent feature detects, analyzes and adjusts the details, depth and appearance of everything you watch or play, making every visual even more realistic.

(Hisense 55U75QG Product Page, available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

| | |
|---|---|
| Processor brand name<br>Brand name of the processor trademarked by the manufacturer. | Hi-View AI Engine Pro (4K) |
| SoC<br>The system-on-chip (SoC) integrates different hardware components such as CPU, GPU, memory and others. | MediaTek Pentonic 800 (MT9655) |
| Processor (CPU)<br>The main function of the processor (CPU) is to interpret and carry out instructions, thus allowing the functioning of the operating system and the software applications. | ARM Cortex-A73 |
| CPU cores<br>The software instructions are performed by the CPU cores. The higher number of cores allows for the parallel (simultaneous) processing of more instructions and achieving higher performance. There are various processors equipped with 1, 2, 4, 6, 8, and more cores. | 4 |
| CPU frequency<br>The clock rate/frequency of the CPU is measured in megahertz (MHz) or gigahertz (GHz) and indicates its working speed. Within one cycle or tick the processor may perform a varied number of instructions. | 1800 MHz (megahertz) |
| GPU<br>The GPU processes computer graphics calculations. It is actively used in games, video decoding/playing, user interface visualization and so on. Its parallel architecture allows for its usage in specific calculations, which are processed more effectively by the GPU than by the CPU. | ARM Mali-G57 MC1 |

(Display Specifications for Hisense 55U75QG, available at https://www.displayspecifications.com/en/model/25104155)


M
Gemini
Home
Live
Apps
Hisense
4
NEW YORK
NEWS
SNL
Featured
Strawberry Shortcake
News
Intelligent Settings
INTELLIGENT PICTURE
Intelligent Scene
Off
Personalized customization
Content Type Auto Detection
Enable to automatically detect the FILMMAKER Mode or IMAX Mode tags in the content, and implement the preferred picture settings contained within.
Press OK to zoom out setting.
Auto Picture Mode
Off
AI Energy Saving
Off
Automatic Light Sensor
Off
INTELLIGENT SOUND


Advanced System
Clear Cache
Clear cache, user data and temporary files for browser and applications.
Turbo Mode
You can enter Device Assistant and enable this function, which will help improve your system performance.
Enhanced Viewing
Product Registration
Registering your TV may help us quickly resolve any potential issues with your TV in the future.
Aspect Configuration
Enhanced Viewing
Automatic Content Recognition
Picture Mode Auto Adaptation
Sound Mode Auto Adaptation
Device UUID
861003009000001000000745jjewquais5t5kzqibmc5bk
orn2xsgv75




68. Further, on information and belief, the Hi-View Engine Pro chipset / processor has a frame rate converter for converting the frame rate of the input image signal by processing the input image signal and adjusting the frame rate of the output signal based on the content type. The frame rate converter operates through the Film Maker Mode functionality and/or the Enhanced Viewing functionality, which, based on information and belief, leverage the processor's analysis engine to adjust the frame rate depending on the detected content type (*e.g.*, genre information).

| Model name | 55U75QG | 65U75QG | 75U75QG | 85U75QG |
|---|---|---|---|---|
| **DISPLAY** | | | | |
| Actual Screen Size (Measured Diagonally) | 54.6" | 64.5" | 74.5" | 84.5" |
| Screen Class | 55" | 65" | 75" | 85" |
| Screen Type | LCD | | | |
| Backlight Source Type | Mini-LED Pro | | | |
| **PICTURE QUALITY** | | | | |
| Screen Resolution | 4K UHD | | | |
| QLED-Quantum Dot Color | QLED Color | | | |
| WCG-Wide Color Gamut | Yes | | | |
| AI PQ Engine | Hi-View AI Engine Pro | | | |
| Full Array Local Dimming | Yes | | | |
| Anti-Glare Low Reflection Panel | Yes | | | |
| Native Refresh Rate | 165Hz | | | |
| Motion Rate | 480 | | | |
| MEMC / Frame Insertion | MEMC /Black Frame Insertion | | | |
| Aspect Ratio | 16:9 | | | |
| Film Maker Mode | Yes | | | |
| IMAX Enhanced | Yes | | | |
| HDR Formats | Dolby Vision, Dolby Vision IQ, HDR10, HDR 10+, HDR10+ Adaptive, HLG | | | |
| Film Maker Mode | Yes | | | |
| IMAX Enhanced | Yes | | | |
| **SMART TV** | | | | |
| Smart Platform | Google TV | | | |
| Google Assistant | Google Assistant Built-in | | | |
| Google Cast | Supports Google Cast | | | |
| Alexa | Works With Alexa | | | |
| Apple Home Kit | Works with Apple HomeKit / Airplay | | | |
| Far Field Mic/Hands Free | Yes | | | |
| **GAMING** | | | | |
| Game Mode | 165Hz Game Mode Ultra | | | |
| VRR/ALLM | Yes | | | |
| Game Bar | Enhanced | | | |
| Game Booster | 288 VRR | | | |
| AMD Freesync | Freesync Premium Pro | | | |
| Nvidia Gsync Compatible | Yes | | | |
| HDR Gaming | Dolby Vision Gaming, HDR10+ Gaming | | | |

(Hisense 55U75QG Specification Sheet, available at https://www.hisense-usa.com/_files/ugd/991681_13aec4e82346429e96aadc444c0d90de.pdf)



69. The foregoing features and capabilities of the Hisense 55U75QG, and Defendants' description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 10 of the '007 Patent, under 35 U.S.C. § 271(a).

70. On information and belief, Defendants further infringe the '007 Patent through additional products (collectively, "the '007 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the Hisense 55U75QG television. The '007 Accused Products include, by way of examples, 40A45H, 100E7SF, 85E7SF, 75E7SF, 65E7SF, 55E7SF, 50E7SF, 100U6SF Pro, 85U6SF Pro, 75U6SF Pro, 65U6SF Pro, 55U6SF Pro, 100U6SF, 85U6SF, 75U6SF, 65U6SF, 55U6SF, 50U6SF, 75U7SF, 65U7SF, 55U7SF, 100E6QF, 85E6QF, 75E6QF, 65E6QF, 55E6QF, 50E6QF, 100QD7QF, 85QD7QF, 75QD7QF, 65QD7QF, 55QD7QF, 50QD7QF, 100U65QF, 85U65QF, 75U65QF, 65U65QF, 55U65QF, 40QD4QF, 100UR9SG, 85UR9SG, 75UR9SG, 65UR9SG, 100UR8SG, 85UR8SG, 75UR8SG, 65UR8SG, 55UR8SG, 116U7SG, 100U7SG, 85U7SG, 75U7SG, 65U7SG, 55U7SG, 85S7SG, 75S7SG, 65S7SG, 55S7SG, 50S7SG, 65M7QG, 55M7QG, 50M7QG, 43H40G, 32H40G, 98QD5030G, 85QD6030G, 75QD6030G, 70QD6030G, 65QD6030G, 55QD6030G, 50QD6030G, 43QD6030G, 65QD5N, 55QD5N, 50QD5N, 43QD5N, 50H5BG, 100U76N, 110UX, 116UX, 100UX, 98UX, 32A45K, 100U70N, 116U75QG, 100U75QG, 85U75QG, 75U75QG, 65U75QG, 55U75QG, 100U8QG, 85U8QG, 75U8QG, 65U8QG, 55U8QG, 100QD7N, 85QD7N, 75QD7N, 65QD7N, 85A6N, 75A6N, 70A6N, 65A6N, 55A6N, 50A6N, 43A6N, 65A65H, 55A65H, 85A7N, 75A7N, 65A7N, 55A7N, 50A7N, 43A7N, 85S7N, 75S7N, 65S7N, 55S7N, 85U6N, 75U6N, 65U6N, 55U6N, 85U7N, 75U7N, 65U7N, 55U7N, 85U8N, 75U8N, 65U8N, 55U8N, 75U75N, 65U75N, 85U9N, 75U9N, 98QD5QG, and 136MX. These additional products each include all necessary

hardware and operating systems and work as described above with respect to the exemplary Hisense television, the Hisense 55U75QG. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the ’007 Accused Products are identified to describe the Defendants’ infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

71. Defendants have indirectly infringed at least claim 10 of the ’007 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing, including through the actions of wholly-owned subsidiaries, the use, offering for sale, selling, or importation of at least the ’007 Accused Products. Defendants’ customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants’ instructions directly infringe one or more claims of the ’007 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 55U75QG located at the following website: https://www.hisense-usa.com/support/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg. Defendant is thereby liable for infringement of the ’007 Patent pursuant to 35 U.S.C. § 271(b).

72. Defendants have indirectly infringed at least claim 10 of the ’007 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the ’007 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for

use in infringement of the '007 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

73. For example, the '007 Accused Products include an input unit to which an image signal is input, an information acquirer for acquiring information concerning the input image signal, a frame rate converter, and a display unit for displaying the image. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '007 Patent pursuant to 35 U.S.C. § 271(c).

74. Defendants have been on notice of the '007 Patent since at the latest, December 24, 2024. By the time of trial, Defendants will thus have known and intended (since receiving such notice), that their continued actions would actively induce and contribute to actual infringement of at least claim 10 of the '007 Patent.

75. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '007 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least December 24, 2024, Defendants have been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the '007 Patent, and that the '007 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '007 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their

actions constitute infringement, Defendants have continued their infringing activities. As such, and based on Defendants' knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the '007 Patent.

76. Maxell has been damaged by Defendants' infringement of the '007 Patent.

**COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 11,477,508**

77. Maxell incorporates paragraphs 1-76 above by reference.

78. U.S. Patent No. 11,477,508 (the "'508 Patent," attached hereto at Exhibit 2) duly issued on October 18, 2022, and is entitled *Portable Terminal, Information Processing Apparatus, Content Display System and Content Display Method.*

79. Maxell is the owner of the '508 Patent and possesses all rights under the '508 Patent, including the exclusive right to recover for past and future infringement.

80. The '508 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

81. Like other validity issues, a patent is presumed eligible under 35 U.S.C. § 101, and can only be found ineligible by clear and convincing evidence. The '508 Patent is patentable under 35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components, such that it does not preempt the technological field.

82. The claims of the ’508 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting content display systems and methods for seamless content hand-off between a mobile terminal and a display apparatus.

83. The ’508 Patent is directed to a display apparatus, such as a smart television, that is configured to receive digital broadcast signals and also to acquire video content via the internet. The display apparatus can switch its operation mode from displaying broadcast television content to displaying internet video content in response to receiving an identifier (such as a URL) from an external mobile terminal (such as a smartphone), without requiring any operation from the television’s physical remote controller. ’508 Patent at 3:27-42, 4:45-5:5. The ’508 Patent specifically relates to a system in which a mobile terminal sends an identifier of video content it is currently displaying to a television, whereupon the television terminates its broadcast display and retrieves and displays the identified internet video content—enabling seamless, single-operation content hand-off. *Id.* at Claims 15-16. The ’508 Patent claims are also directed to the display apparatus accepting remote operation commands from the external mobile terminal (which is different from the TV’s remote controller) to control playback of the handed-off internet video content, and to terminating the second operation mode (mode of displaying internet video content) in response to further information from the mobile terminal. *Id.*

84. Prior to the filing of the ’508 Patent application, content display systems could not seamlessly hand off video content being viewed on a mobile terminal to a separate display device. Instead, prior art systems required the user to terminate viewing on the portable terminal and then separately re-select or re-navigate to the content on the display device, which led to an increase in

the number of operation steps. *See, e.g., id.* at 2:46-3:26. The specification expressly states that "description has not been given of an idea to achieve a smoother cooperative operation when the viewing of a content just being conducted on the portable terminal is to be relayed or passed to the video playback device." *Id.* at 3:18-21. Furthermore, "change-over operations" of internet content from the mobile terminal to another display device caused numerous problems, requiring multiple user operations and interrupting the viewing experience. *Id.* at 2:46-3:26.

85. The asserted claims of the '508 Patent recite an improved display apparatus with specific means of controlling the display video state according to distinct action-triggering information acquired and received from an external mobile terminal. '508 Patent at Claim 15. Specifically, the display apparatus includes: a digital broadcast receiver for receiving a digital broadcast signal; a signal separator for de-multiplexing the signal into video and audio data; a video processor for converting the format of video data; an audio processor for converting the format of audio data; wireless transceiver circuitry for communicating over the internet to acquire video content and to receive information from the external mobile terminal; an infrared (IR)-ray receiver for receiving an operation signal from a remote controller; a display panel; and a controller that controls operation modes—including transitioning from a first operation mode (broadcast display) to a second operation mode (internet video display based on a received identifier from the mobile terminal)and termination of the second operation mode. *Id.* at Claim 15.

86. The asserted claims of the '508 Patent claim an improved solution to these systems by using information (the claimed identifier and operation instructions) from the external mobile terminal to control the display apparatus's operation mode and to perform change-over and operation of internet video content between the devices without requiring input from the remote controller. *Id.* at Claim 15. For example, when the TV set receives the identifier for video content

from the cellular phone via the wireless transceiver circuitry, the controller terminates the first operation mode (broadcast display) and starts the second operation mode, retrieves the identified video content via the internet, and displays it on the display panel. *Id.* at 5:45-6:65; Claim 15. This results in the smooth, uninterrupted, and seamless relay of internet video content to the display apparatus from a mobile terminal—without conducting any operation on the remote controller. The user can display the internet site on a larger screen through a simple operation using only the mobile terminal. *Id.* at 5:5-15.

87. The claims of the '508 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow a display apparatus to seamlessly receive content identifiers from an external mobile terminal, switch operation modes without remote controller input, acquire and display content using those identifiers, and accept remote operation instructions from the mobile terminal. These capabilities were not previously available and represent a marked technical improvement to the functionality of content display systems. *Id.* at Claims 15-16.

88. The components of the '508 Patent are not generic or conventional. For example, the display apparatus includes a digital broadcast receiver, a signal separator for de-multiplexing, specialized video and audio processing units (such as Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), and Micro Processing Units (MPUs)), wireless transceiver circuitry configured for both internet access and mobile terminal communication, and an infrared (IR)-ray receiver for receiving operation signals from a remote

controller. *Id.* at 5:25-55. When viewed as a whole, the claimed elements work together in a specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) seamless single-operation content transfer from a mobile terminal to the display apparatus with automatic operation mode switching and broadcast display termination; (2) bidirectional control enabling the display apparatus to be remotely operated by the mobile terminal for displayed internet content, separate from the physical remote controller; (3) state information transmission (claim 16) allowing the display apparatus to take over the displaying state of the mobile terminal; and (4) coordinated communication using the display apparatus's separate wireless transceiver circuitry and IR receiver pathways. *Id.* at Claims 15-16; 5:25-6:65.

89. These features produce specific, tangible technical benefits: no operation required on the TV side, seamless viewing continuation when transitioning between screens (claim 16's state information takeover), enhanced remote operation capability via the mobile terminal distinct from the remote controller, and elimination of the need to re-navigate or re-authenticate content on the display device. *Id.* at 3:4-42. These concrete improvements distinguish the claims from abstract ideas lacking such technological benefits.

90. The '508 Patent family has also been cited 110 times including, for example, by Apple Inc. (*e.g.*, 10,972,536), Panasonic Corporation (*e.g.*, 8,560,012), LG Electronics Inc. (*e.g.*, EP2573247), Sony Corporation (*e.g.*, 9,503,773), Microsoft Corporation (*e.g.*, 2011/0296472), Google Inc. (*e.g.*, 2012/0050183), Amazon Technologies, Inc. (*e.g.*, 9,195,768), Toshiba Corp (*e.g.*, JP2013131163A), Sonos, Inc. (*e.g.*, 9,674,587), and Denso Corporation (*e.g.*, EP2712152). The patents (and entities) citing the '508 Patent family recognize that the '508 Patent was directed

to technical improvement in wireless communication, content hand-off, and seamless content display systems between mobile terminals and display apparatuses.

91. Defendants have directly infringed one or more claims of the ’508 Patent in this judicial district and elsewhere in Texas, including at least claims 15 and 16 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the Hisense 55U75QG television.

92. The Hisense 55U75QG is a smart television with a display panel, which can connect to a wireless network to access the internet through its wireless adapter and can receive content through its applications. It can also display broadcast television. The Hisense 55U75QG, while connected to a digital HDTV antenna, and in response to an operation signal from its remote controller, the display panel displayed a television broadcast content (e.g., channel “4.1 WRC-HD”). The Hisense 55U75QG’s remote controller includes a dedicated physical button for the Prime Video application, and its packaging bears a Prime Video icon, confirming that the television is equipped with Prime Video functionality. The Hisense 55U75QG can receive digital television broadcast signals over the air or over cable, for example, RF Input or via cable, in digital formats such as NTSC/Clear QAM/ATSC 3.0 (NextGen TV) and can de-multiplex the digital broadcast signal into video and audio to display on its display panel and output on its speaker or audio output channels. The Hisense 55U75QG also has a video processor for converting the format of video data and an audio processor for converting the format of audio data.










93. The Hisense 55U75QG is equipped with a network interface allowing it to communicate with other devices on the same network, such as Wi-Fi enabled mobile terminals such as smartphones, and allowing it to receive data from an external mobile terminal. Testing screenshots below show that the Hisense 55U75QG was connected to a Wi-Fi network and

communicated over that network with an external smartphone (a Motorola razr+ 2023) connected to the same Wi-Fi network. The Hisense 55U75QG also has an infra-red (IR) receiver that receives commands from its remote controller that is different from the external mobile terminal.









94. The Hisense 55U75QG has a system processor (controller) configured to control the operation of the Hisense 55U75QG, including its display. The system processor controls the display to show a first video content received via a broadcast signal in a first operation mode in response to reception of an operation signal from the remote controller via the IR receiver. The system processor also responds to communications received over its network interface from an external mobile terminal (which is different from the remote controller). As shown in the screenshots below, while the Hisense 55U75QG was displaying broadcast television content, an external smartphone displaying Amazon Prime Video content (e.g., "Spider-Noir") over its own screen was used to cast that content to the television: the user pressed the casting icon on the smartphone's Prime Video application and selected the television as the cast target. Once the casting operation was sent from the smartphone, the Hisense 55U75QG stopped displaying the broadcast television content and retrieved and displayed the Prime Video content via the internet, with the content displayed on the television resuming from the same playback position at which it had been displayed on the smartphone. When the external mobile terminal transmits first information including an identifier for identifying a second video content to the Hisense 55U75QG via its wireless transceiver circuitry without an operation input from the remote controller, the system processor terminates display of the first (broadcast) video content and retrieves and displays the second video content via the internet based on the identifier.


HOT
PICKS
#HOTPICKS


Spider-Noir
S1 E1 Step Into My Office
1x
04:34
-42:22
Nicolas Cage - Ben Reilly
X-Ray
Alternate Versions


04:34
Nicolas Cage -


1:16
Cast to device
SmartTV 4K FFM
SmartTV 4K FFM
Learn more about casting













95. The processor in the Hisense 55U75QG executes operation instructions (second information) received from the external mobile terminal via its wireless transceiver circuitry,

without an operation input from the remote controller, while the second video content is being displayed, including playback control instructions received from the mobile terminal. As shown in the screenshots below, while the Prime Video content was being cast to and displayed on the Hisense 55U75QG, the smartphone displayed on-screen buttons to pause/play, rewind, and fast forward the content. In response to a pause instruction sent from the smartphone, the Prime Video content displayed on the television was paused; in response to a subsequent play instruction sent from the smartphone, the paused content resumed playing on the television. The second information (the operation instructions from the smartphone) is different from the first information (the casting operation from the smartphone).








96. The controller in the Hisense 55U75QG is further configured to terminate the second operation mode in response to reception of third information from the external mobile terminal via the wireless transceiver circuitry without an operation input from the remote controller. As shown in the screenshots below, the user pressed the casting icon on the smartphone

and selected "Stop casting," and in response to that third information, the casting of the Prime Video content to the Hisense 55U75QG was terminated.




2:53
X-Ray
In Scene
Cast
Music
Larry Herron
Portrays: Busboy
IMDb
Nicolas Cage
Portrays: Ben Reilly
IMDb
SmartTV 4K FFM
Stop casting




97. Furthermore, with respect to dependent claim 16, the first information transmitted from the external mobile terminal to the Hisense 55U75QG further includes state information indicating a state of displaying of the video content on the external mobile terminal when the first information is sent (e.g., the playback position of the Prime Video content on the smartphone at the time of casting). The controller in the Hisense 55U75QG controls a state of displaying of the video content on the external mobile terminal at a time when the first information is sent from the external mobile terminal to be taken over to a state of displaying of the second video content on the display panel at a time when the display panel starts displaying the second video content, based on the state information. As shown in the screenshots below, the Prime Video content ("Spider-Noir") was being displayed on the smartphone at a playback position of 04:34 immediately before casting; upon casting, the same content was displayed on the Hisense 55U75QG's display panel from that same playback position, demonstrating that the state information (including the reproduction position/time of the video content) was sent from the smartphone to the television.













98. The foregoing features and capabilities of the Hisense 55U75QG, and Hisense's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claims 15 and 16 of the '508 Patent, under 35 U.S.C. § 271(a).

99. On information and belief, Defendants further infringe the '508 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the Hisense 55U75QG (collectively, "the '508 Accused Products"). The '508 Accused Products include, by way of examples, 40A45H, 100E7SF, 85E7SF, 75E7SF, 65E7SF, 55E7SF, 50E7SF, 100U6SF Pro, 85U6SF Pro, 75U6SF Pro, 65U6SF Pro, 55U6SF Pro, 100U6SF, 85U6SF, 75U6SF, 65U6SF, 55U6SF, 50U6SF, 75U7SF, 65U7SF, 55U7SF, 75A7NF, 65A7NF, 55A7NF, 50A7NF, 43A7NF, 100E6QF, 85E6QF, 75E6QF, 65E6QF, 55E6QF, 50E6QF, 43E6QF, 43A4NF,

40A4NF, 32A4NF, 32S5QF, 43S5QF, 100QD6QF, 85QD6QF, 75QD6QF, 65QD6QF, 55QD6QF, 50QD6QF, 43QD6QF, 75QD65NF, 65QD65NF, 55QD65NF, 50QD65NF, 43QD65NF, 100QD7QF, 85QD7QF, 75QD7QF, 65QD7QF, 55QD7QF, 50QD7QF, 100U65QF, 85U65QF, 75U65QF, 65U65QF, 55U65QF, 40QD4QF, 100UR9SG, 85UR9SG, 75UR9SG, 65UR9SG, 100UR8SG, 85UR8SG, 75UR8SG, 65UR8SG, 55UR8SG, 116U7SG, 100U7SG, 85U7SG, 75U7SG, 65U7SG, 55U7SG, 85S7SG, 75S7SG, 65S7SG, 55S7SG, 50S7SG, 65M7QG, 55M7QG, 50M7QG, 43H40G, 32H40G, 98QD5030G, 85QD6030G, 75QD6030G, 70QD6030G, 65QD6030G, 55QD6030G, 50QD6030G, 43QD6030G, 65QD5N, 55QD5N, 50QD5N, 43QD5N, 50H5BG, 100U76N, 110UX, 116UX, 100UX, 98UX, 32A45K, 100U70N, 116U75QG, 100U75QG, 85U75QG, 75U75QG, 65U75QG, 55U75QG, 100U8QG, 85U8QG, 75U8QG, 65U8QG, 55U8QG, 100QD7N, 85QD7N, 75QD7N, 65QD7N, 85A6N, 75A6N, 70A6N, 65A6N, 55A6N, 50A6N, 43A6N, 65A65H, 55A65H, 85A7N, 75A7N, 65A7N, 55A7N, 50A7N, 43A7N, 85S7N, 75S7N, 65S7N, 55S7N, 85U6N, 75U6N, 65U6N, 55U6N, 85U7N, 75U7N, 65U7N, 55U7N, 85U8N, 75U8N, 65U8N, 55U8N, 75U75N, 65U75N, 85U9N, 75U9N, 98QD5QG, 58QD50R, 43A4NR, 40A4NR, 32A4NR, 32H4030F3, 85R6E3, 75R6E4, 70R6E4, 65R6E4, 58R6E3, 50R6E3, 43R6E3, 75U6SV Pro, 65U6SV Pro, 55U6SV Pro, and 136MX. These additional products each include all necessary hardware and operating systems and work as described above with respect to the Hisense 55U75QG. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the ’508 Accused Products are identified to describe the Defendants’ infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

100. Defendants have been on notice of the ’508 Patent since at least December 24, 2024.

101. Since at least December 24, 2024, Defendants have indirectly infringed at least claims 15 and 16 of the ’508 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the ’508 Accused Products. Defendants’ customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants’ instructions directly infringe one or more claims of the ’508 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 55U75QG located at the following website: https://www.hisense-usa.com/support/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg. Defendants are thereby liable for infringement of the ‘508 Patent pursuant to 35 U.S.C. § 271(b).

102. Since at least December 24, 2024, Defendants have indirectly infringed at least claims 15 and 16 of the ’508 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the ‘508 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the ’508 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

103. For example, the ’508 Accused Products include specific software and/or firmware routines configured to: (1) receive, via the wireless transceiver circuitry, an identifier for video content from a mobile terminal; (2) responsively terminate display of broadcast video content and retrieve and display the identified video content via the internet; (3) accept and execute remote operation commands from the mobile terminal while the retrieved content is displayed; and (4) terminate that operation mode in response to further information from the mobile terminal. These specific casting, operation-mode-switching, and remote-control routines—as distinct from the ’508 Accused Products’ general-purpose broadcast-tuning and application-processing functionality, which does not practice the ’508 Patent—are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and, upon information and belief, are not staple articles or commodities of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the ’508 Patent pursuant to 35 U.S.C. § 271(c).

104. Defendants know and intend that their continued actions will actively induce and contribute to actual infringement of at least claims 15 and 16 of the ’508 Patent.

105. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the ’508 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the ’508 Patent, nor could they reasonably, subjectively believe that the patent is invalid. As an example, since at least December 24, 2024, Defendants have been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the ’508 Patent, and that the ’508 Patent is valid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement,

Defendants have continued their infringing activities. As such, and based on Defendants' knowledge of their likely infringement and the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the '508 Patent.

106. Maxell has been damaged by Defendants' infringement of the '508 Patent.

**COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 7,730,507**

107. Maxell incorporates paragraphs 1-106 above by reference.

108. U.S. Patent No. 7,730,507 (the "'507 Patent," attached hereto at Exhibit 3) duly issued on June 1, 2010 and is entitled *Broadcast Receiving Apparatus and Starting Method Thereof*.

109. Maxell is the owner of the '507 Patent and possesses all rights under the '507 Patent, including the exclusive right to recover for past and future infringement.

110. The '507 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

111. The '507 Patent is directed to a broadcast program receiving apparatus, such as a television. This apparatus is distinctively characterized by its design incorporating two separate waiting conditions, each with different levels of electric power consumption. In its lower power mode (waiting mode / the first waiting condition), critical components like the television's main decoder and the primary processor responsible for its operating system (referred to as the "second

controller" in Claim 1 of the patent) are powered down. The patent operates within the relevant technical field of digital broadcast receiving apparatuses that perform signal processing.

112. The '507 Patent explains that a significant problem plagued digital broadcast receiving systems, particularly in the 2005-2006 timeframe. As detailed in the patent's background section, "it takes times for receiving the digital broadcasting signal, in particular, just after turning ON an electric power of a set, until when it displays an image on a screen after receiving a channel, comparing to the receiving of the conventional analog broadcasting signal." '507 Patent at 1:45-50. This delay, which could amount to "about 10 seconds or more" (*Id*. at 1:61-62), was primarily due to the necessity of loading operating systems and initializing various devices. This extended boot-up period resulted in an unacceptable lag time that was "irritating to a viewer." *Id*. at 1:63-65.

113. The '507 Patent solved these problems by, for example, providing a digital broadcast receiving apparatus featuring a first and a second waiting condition, during which no image is displayed. Claim 1 details that under the "first waiting condition," electric power is not supplied to the "second controller configured to be started up by a predetermined OS to control a processing of a received digital broadcasting signal via a decoder," nor to the decoder itself. This creates a very low power standby state. In contrast, under the "second waiting condition," electric power is supplied to this second controller and the decoder, allowing these components to boot up or maintain a state of readiness in advance of a user's command to fully power on the display. This innovative approach, as stated in the patent's abstract, results in "shortening or reducing the waiting time after the startup of the apparatus with suppressing the electric power consumption under the waiting condition thereof" *Id*. at Abstract. This significantly improved the user experience by enabling a quick start, irrespective of the main CPU or OS boot requirements, while

still effectively managing power consumption. This solution was developed during a period (2005-2006) when high-definition digital TVs capable of receiving digital broadcast signals were becoming mainstream, but "smart TVs" possessing such dual waiting conditions were not yet available. On information and belief, such advanced standby features were not readily available in the U.S. market until around 2011 and took even longer to become common. During the 2005-2006 timeframe, televisions capable of quickly powering on quickly and displaying digital broadcasts without significant delay were not known, underscoring that the inventors conceived this solution (as early as August 25, 2006) well before the widespread adoption of similar technologies.

114. Defendants have directly infringed one or more claims of the '507 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, and 13 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the Hisense 55A7NF television.

115. The Hisense 55A7NF is a smart television that can display programs received via digital broadcasting signal such as from, for example, a connected cable or VHF/UHF antenna. The Hisense 55A7NF includes a main board, a timing controller (T-CON) board, and a power board, containing various circuitry and components, as shown below:



116. On information and belief, the Hisense 55A7NF includes processors and/or a processor with multiple cores that perform instructions such as those performed by its central processing unit. On information and belief, the System on Chip (SoC) architecture in the Hisense 55A7NF enables distinct functionalities equivalent to the “first controller” and “second controller” as claimed in the ’507 Patent.

117. Specifically, on information and belief, certain SoC functionalities, potentially utilizing dedicated low-power cores or specific power management units, operate as the first controller by managing the television's waiting modes (including lower-power standby states responsive to remote control signals) and controlling power distribution in a manner consistent with the claimed first controller’s lower power consumption relative to the second controller.

118. Concurrently, on information and belief, other primary cores within the same SoC function as the second controller. These cores are started up by a predetermined Operating System to control the processing of received digital broadcasting signals via an associated decoder, thereby performing the main operational tasks of the television as claimed for the second controller.

## System on Chip (SoC)

Information about the central processor, graphic processor and the memory of the model.

| | |
|---|---|
| **SoC**<br>The system-on-chip (SoC) integrates different hardware components such as CPU, GPU, memory and others. | MediaTek MT9602 |
| **Processor (CPU)**<br>The main function of the processor (CPU) is to interpret and carry out instructions, thus allowing the functioning of the operating system and the software applications. | ARM Cortex-A53 |
| **CPU cores**<br>The software instructions are performed by the CPU cores. The higher number of cores allows for the parallel (simultaneous) processing of more instructions and achieving higher performance. There are various processors equipped with 1, 2, 4, 6, 8, and more cores. | 4 |
| **CPU frequency**<br>The clock rate/frequency of the CPU is measured in megahertz (MHz) or gigahertz (GHz) and indicates its working speed. Within one cycle or tick the processor may perform a varied number of instructions. | 1500 MHz (megahertz) |
| **GPU**<br>The GPU processes computer graphics calculations. It is actively used in games, video decoding/playing, user interface visualization and so on. Its parallel architecture allows for its usage in specific calculations, which are processed more effectively by the GPU than by the CPU. | ARM Mali-G52 |
| **GPU frequency**<br>The clock rate/frequency of the contemporary GPUs is measured in megahertz (MHz) or gigahertz (GHz) and indicates their level of performance. | 850 MHz (megahertz) |

(Display Specifications for 55-inch Fire TV, available at https://www.displayspecifications.com/en/model/b8203f39)

119. The Hisense 55A7NF has "Power Control" settings and modes that control the television's ability to adjust power consumption. For example, the Hisense 55A7NF can be put in a sleep mode in which power consumption is limited to around 0.5 W. The 55-inch Fire TV includes an SOC, CPU, and power control circuit, one or more of which acts as a first controller configured to control a waiting mode of the television.

## Power supply and consumption

Information about the power supply and consumption, energy efficiency class, etc.

| | |
|---|---|
| 110V<br>Permissible voltage tolerance in a 110-volt electric system. | ≈ 100 V - 120 V (volts) |
| 220V<br>Permissible voltage tolerance in a 220-volt electric system. | ≈ 220 V - 240 V (volts) |
| Alternating current frequency<br>Requirement regarding the alternating current frequency in the electric system. | ≈ 50 Hz - 60 Hz (hertz) |
| Power consumption (sleep)<br>Power consumption in sleep/stand by/suspend mode. | ≈ 0.5 W (watts) |
| Power consumption (average)<br>Average power consumption in standard work mode. | ≈ 120 W (watts) |

(55-inch Fire TV - Specifications available at https://www.displayspecifications.com/en/model/b8203f39)

120. The Hisense 55A7NF implements at least a predetermined OS to control a processing of a received digital broadcasting signal via a decoder by its Fire TV operating system controlling the capabilities and power modes of the television to be controlled remotely, even during sleep or lower power modes in which the display is turned off. For example, the Hisense 55A7NF has a power mode in which the television is enabled to receive voice commands via Alexa-enabled or Apple HomeKit enabled devices, even when the display is turned off. Based on information and belief, the low-power mode/sleep/stand by mode in which the Hisense 55A7NF can receive remote-control signals, but cannot receive voice commands from Alexa- and/or Apple HomeKit-enabled devices serves as a first waiting condition. The low-power/sleep/stand by mode that enables the Hisense 55A7NF to receive both of remote-control signals and voice commands from Alexa- and/or Apple HomeKit-enabled devices while the display is off serves as a second waiting condition.


POWER CONTROLS
Power On
Home
nmands When TV Screen is Off
ON
Display & Sounds
When enabled, you can give voice commands through a linked Alexa-enabled or Apple HomeKit device even when your TV screen is off. Turn on your TV, access entertainment, control smart home, playback, and more with voice commands. Your TV screen may turn on to complete voice commands.
Enabling this setting may increase your TV's power consumption.


Allow your TV to automatically turn on when you give voice commands through a linked Alexa or Apple HomeKit-enabled device?
Enabling this setting may increase your TV's power consumption.
YES
NO

>

121. Under information and belief, processor(s) and/or component(s) of the Hisense 55A7NF control the power mode operations of the Hisense 55A7NF, such as, for example, a processor or circuitry of the main board and controller for controlling the TV's waiting modes, and a processor or circuitry that is also configured to be started up by a predetermined OS to control a processing of a received digital broadcasting signal via a decoder.

122. The foregoing features and capabilities of the Hisense 55A7NF, and Defendants' description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claims 1, 2, and 13 of the '507 Patent, under 35 U.S.C. § 271(a).

123. On information and belief, Defendants further infringe the '507 Patent through additional products (collectively, "the '507 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the Hisense 55A7NF television. The '507 Accused Products include, by way of examples, 40A45H, 100E7SF, 85E7SF, 75E7SF, 65E7SF, 55E7SF, 50E7SF, 100U6SF Pro, 85U6SF Pro, 75U6SF Pro, 65U6SF Pro, 55U6SF Pro, 100U6SF, 85U6SF, 75U6SF, 65U6SF, 55U6SF, 50U6SF, 75U7SF, 65U7SF, 55U7SF, 75A7NF, 65A7NF, 55A7NF, 50A7NF, 43A7NF, 100E6QF, 85E6QF, 75E6QF, 65E6QF, 55E6QF, 50E6QF, 43A4NF, 40A4NF, 32A4NF, 32S5QF, 43S5QF, 100QD6QF, 85QD6QF, 75QD6QF, 65QD6QF, 55QD6QF, 50QD6QF, 43QD6QF, 75QD65NF, 65QD65NF, 55QD65NF, 50QD65NF, 43QD65NF, 100QD7QF, 85QD7QF, 75QD7QF, 65QD7QF, 55QD7QF, 50QD7QF, 100U65QF, 85U65QF, 75U65QF, 65U65QF, 55U65QF, 40QD4QF, 100UR9SG, 85UR9SG, 75UR9SG, 65UR9SG, 100UR8SG, 85UR8SG, 75UR8SG, 65UR8SG, 55UR8SG, 116U7SG, 100U7SG, 85U7SG, 75U7SG, 65U7SG, 55U7SG, 85S7SG, 75S7SG, 65S7SG, 55S7SG, 50S7SG, 65M7QG, 55M7QG, 50M7QG, 43H40G, 32H40G, 98QD5030G, 85QD6030G, 75QD6030G, 70QD6030G,

65QD6030G, 55QD6030G, 50QD6030G, 43QD6030G, 65QD5N, 55QD5N, 50QD5N, 43QD5N, 50H5BG, 100U76N, 110UX, 116UX, 100UX, 98UX, 32A45K, 100U70N, 116U75QG, 100U75QG, 85U75QG, 75U75QG, 65U75QG, 55U75QG, 100U8QG, 85U8QG, 75U8QG, 65U8QG, 55U8QG, 100QD7N, 85QD7N, 75QD7N, 65QD7N, 85A6N, 75A6N, 70A6N, 65A6N, 55A6N, 50A6N, 43A6N, 65A65H, 55A65H, 85A7N, 75A7N, 65A7N, 55A7N, 50A7N, 43A7N, 85S7N, 75S7N, 65S7N, 55S7N, 85U6N, 75U6N, 65U6N, 55U6N, 85U7N, 75U7N, 65U7N, 55U7N, 85U8N, 75U8N, 65U8N, 55U8N, 75U75N, 65U75N, 85U9N, 75U9N, 98QD5QG, 58QD50R, 43A4NR, 40A4NR, 32A4NR, 32H4030F3, 85R6E3, 75R6E4, 70R6E4, 65R6E4, 58R6E3, 50R6E3, and 43R6E3. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary Hisense television, the Hisense 55A7NF. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '507 Accused Products are identified to describe the Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

124. Defendants have indirectly infringed at least claims 1, 2, and 13 of the '507 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '507 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '507 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 55A7NF located at the following website:https://www.hisense-usa.com/product-page/televisions-55-class-a7-series-lcd-4k-fire-tv-

55a7nf. Defendants are thereby liable for infringement of the ’507 Patent pursuant to 35 U.S.C. § 271(b).

125. Defendants have indirectly infringed at least claims 1, 2, and 13 of the ’507 Patent, by, among other things, contributing to the direct infringement of others, including customers of the ’507 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the ’507 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

126. For example, the ’507 Accused Products include a remote sensor configured to receive a remote control signal for operating the display, and a processor with software for controlling a processing of a received digital broadcasting signal via a decoder. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the ’507 Patent pursuant to 35 U.S.C. § 271(c).

127. Defendants have been on notice of the ’507 Patent since at least December 24, 2024. By the time of trial, Defendants will thus have known and intended (since receiving such notice), that their continued actions would actively induce and contribute to actual infringement of at least claims 1, 2, and 13 of the ’507 Patent.

128. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the ’507 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least December 24, 2024, Defendants have been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the ’507 Patent, and that the ’507 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the ‘507 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants have continued their infringing activities. As such, and based on Defendants’ knowledge of the strength and value of Maxell’s portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the ’507 Patent.

129. Maxell has been damaged by Defendants’ infringement of the ’507 Patent.

**COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 10,459,270**

130. Maxell incorporates paragraphs 1-129 above by reference.

131. U.S. Patent No. 10,459,270 (the “’270 Patent,” attached hereto at Exhibit 4) duly issued on October 29, 2019 and is entitled *Display Device*.

132. Maxell is the owner by assignment of the ’270 Patent and possesses all rights under the ’270 Patent, including the exclusive right to recover for past and future infringement.

133. The ’270 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

134. The ’270 Patent is directed to a display device. This device includes a display, at least one light source unit (which comprises a light source, a diffusing lens that covers the light source, and a substrate to which the light source is mounted), a housing to which the at least one light source unit is attached via its inner surface, and a reflective sheet. A key feature of the light source assembly is that the reflective sheet has a plurality of holes corresponding to the light sources and is positioned between the substrate and the diffusing lens. ’270 Patent at Abstract.

135. The ’270 Patent explains that conventional display devices encountered issues related to component count and assembly complexity, particularly when positioning and fixing heat dissipation members (associated with light sources) to holding members like back panels. Specifically, the use of separate fasteners such as nuts and bolts resulted in an increased “number of required parts, and the work entailed by tightening the nuts and bolts increases the number of assembly steps.” *Id*. at 1:38-45.

136. The ’270 Patent solved these problems by providing a display device designed to reduce the number of parts and assembly steps. *Id*. at 1:55-57. This is exemplified by a design where the sheet metal holding member (referred to as a rear frame in the detailed description) integrally includes features such as a positioning component for a heat dissipation member and a fixing component for securing the positioned heat dissipation member without requiring separate fasteners like nuts and bolts. *Id*. at 7:4-11. This integral design approach directly reduces both the number of individual parts and the complexity of the assembly process. The patent also describes

that such positioning components can include features designed to suppress the warping of the heat dissipation member that might occur due to heat generated from the light source. The light source unit itself, as mentioned, comprises a light source, a diffusing lens, and a substrate, with the reflective sheet (which has holes for the light sources) carefully disposed between the substrate and the diffusing lens. The housing facilitates this assembly by having an inner surface to which the light source unit is attached, and specific positioning portions on the housing are used to hold the light source unit in place. *Id*. at Abstract.

137. Defendants have directly infringed one or more claims of the ’270 Patent in this judicial district and elsewhere in Texas, including at least claims 6, 10, and 12 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the Hisense 50R6E5 television.

138. The Hisense 50R6E5 is a television that includes a display utilizing an LED-based backlight system to illuminate its display panel. This system includes multiple light source units, each comprising an LED light and a diffusing lens that covers the LED light to spread the concentrated light from the LED outward. These two components make up a light source unit, which is mounted on top of the substrate, a circuit board strip.



139. The Hisense 50R6E5 includes a housing wherein the light source units are attached. Further, a white plastic reflective sheet has holes that align with the light source units**.** This sheet is positioned between the substrate and the light source units.




140. The housing of the Hisense 50R6E5 contains integrally formed features – specifically, the embossed, peg-like protrusions. These protrusions function as the "positioning portion." These embossed pegs physically engage the substrate by inserting into holes located along the center of the substrate strip on which the light source units are mounted. This physical engagement restricts the movement of the substrate and secures its location and orientation relative to the housing. This securing function demonstrates that the "positioning portion" holds the light source unit. The positioning portion is integrally formed on the inner surface of the housing. Further, the positioning portion includes a contact component that extends in a direction perpendicular to a display surface of the display and has a first dimension measured in the direction perpendicular to the display surface of the display.




141. The main structural rear panel of the television, a large piece of sheet metal forming the back cover, serves as the back housing.

142. The inner surface of the housing has a recess, comprising indentations formed therein, that extends in a transverse direction of the housing.




143. The foregoing features and capabilities of the Hisense 50R6E5 and Defendants' description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claims 6, 10, and 12 of the '270 Patent, under 35 U.S.C. § 271(a).

144. On information and belief, Defendants further infringe the '270 Patent through additional products (collectively, "the '270 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the Hisense 50R6E5 television. The '270 Accused Products include, by way of examples, 40A45H, 100E7SF, 85E7SF, 75E7SF, 65E7SF, 55E7SF, 50E7SF, 100U6SF Pro, 85U6SF Pro, 75U6SF Pro, 65U6SF Pro, 55U6SF Pro, 100U6SF, 85U6SF, 75U6SF, 65U6SF, 55U6SF, 50U6SF, 75U7SF, 65U7SF, 55U7SF, 75A7NF, 65A7NF, 55A7NF, 50A7NF, 43A7NF, 100E6QF, 85E6QF, 75E6QF, 65E6QF, 55E6QF, 50E6QF, 43E6QF, 43A4NF, 40A4NF, 32A4NF, 32S5QF, 43S5QF, 100QD6QF, 85QD6QF, 75QD6QF, 65QD6QF,

55QD6QF, 50QD6QF, 43QD6QF, 75QD65NF, 65QD65NF, 55QD65NF, 50QD65NF, 43QD65NF, 100QD7QF, 85QD7QF, 75QD7QF, 65QD7QF, 55QD7QF, 50QD7QF, 100U65QF, 85U65QF, 75U65QF, 65U65QF, 55U65QF, 40QD4QF, 100UR9SG, 85UR9SG, 75UR9SG, 65UR9SG, 100UR8SG, 85UR8SG, 75UR8SG, 65UR8SG, 55UR8SG, 116U7SG, 100U7SG, 85U7SG, 75U7SG, 65U7SG, 55U7SG, 65M7QG, 55M7QG, 50M7QG, 43H40G, 32H40G, 98QD5030G, 85QD6030G, 75QD6030G, 70QD6030G, 65QD6030G, 55QD6030G, 50QD6030G, 43QD6030G, 65QD5N, 55QD5N, 50QD5N, 43QD5N, 50H5BG, 100U76N, 110UX, 116UX, 100UX, 98UX, 32A45K, 100U70N, 116U75QG, 100U75QG, 85U75QG, 75U75QG, 65U75QG, 55U75QG, 100U8QG, 85U8QG, 75U8QG, 65U8QG, 55U8QG, 100QD7N, 85QD7N, 75QD7N, 65QD7N, 85A6N, 75A6N, 70A6N, 65A6N, 55A6N, 50A6N, 43A6N, 65A65H, 55A65H, 85A7N, 75A7N, 65A7N, 55A7N, 50A7N, 43A7N, 85U6N, 75U6N, 65U6N, 55U6N, 85U7N, 75U7N, 65U7N, 55U7N, 85U8N, 75U8N, 65U8N, 55U8N, 75U75N, 65U75N, 85U9N, 75U9N, 98QD5QG, 58QD50R, 43A4NR, 40A4NR, 32A4NR, 32H4030F3, 85R6E3, 75R6E4, 70R6E4, 65R6E4, 58R6E3, 50R6E3, 43R6E3, 75U6SV Pro, 65U6SV Pro, 55U6SV Pro, and 136MX. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary Hisense television, the Hisense 50R6E5. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the ’270 Accused Products are identified to describe the Defendants’ infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

145. Defendants have indirectly infringed at least claims 6, 10, and 12 of the ’270 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing

the use, offering for sale, selling, or importation of at least the ’270 Accused Products. Defendants’ customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants’ instructions directly infringe one or more claims of the ’270 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 50R6E5 located at the following websites:https://www.hisense-usa.com/support/televisions-50-class-r6-series-4k-uhd-roku-tv-50r6e3; https://meidiusa.com/wp-content/uploads/50R6E550A6NR58R6E5.pdf. Defendants are thereby liable for infringement of the ’270 Patent pursuant to 35 U.S.C. § 271(b).

146. Defendants have indirectly infringed at least claims 6, 10, and 12 of the ’270 Patent, by, among other things, contributing to the direct infringement of others, including customers of the ’270 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the ’270 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

147. For example, the ’270 Accused Products include hardware that is designed to improve display device assembly by using a housing with a specific positioning portion to hold the light source unit, reducing the number of parts and steps. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the ’270 Patent pursuant to 35 U.S.C. § 271(c).

148. Defendants have been on notice of the ’270 Patent since at least December 24, 2024. By the time of trial, Defendants will thus have known and intended (since receiving such notice), that their continued actions would actively induce and contribute to actual infringement of the ’270 Patent.

149. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the ’270 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least December 24, 2024, Defendants have been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the ’270 Patent, and that the ’270 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the ’270 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants have continued their infringing activities. As such, and based on Defendants’ knowledge of the strength and value of Maxell’s portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the ’270 Patent.

150. Maxell has been damaged by Defendants’ infringement of the ’270 Patent.

**COUNT 5 - INFRINGEMENT OF U.S. PATENT NO. 10,291,877**

151. Maxell incorporates paragraphs 1-150 above by reference.

152. U.S. Patent No. 10,291,877 (the “’877 Patent,” attached hereto at Exhibit 5) duly issued on May 14, 2019 and is entitled *Display and Television Set*.

153. Maxell, Ltd. is the owner, by assignment, of the ’877 Patent and possesses all rights under the '877 Patent, including the exclusive right to recover for past and future infringement.

154. The ’877 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

155. The ’877 Patent is directed to a display and a television set, each including a display panel support member (board mounting portion) that supports a display panel, a circuit board arranged at one surface of the board mounting portion, and a cover member (cover portion) mounted to cover a portion of that surface.

156. The ’877 Patent explains that, in conventional displays, a circuit board was arranged at the back of the display panel and covered by a planar rear surface, which made it difficult to arrange and mount a cover member at a prescribed position and thereby deteriorated mounting workability.

157. The ’877 Patent solved these problems by providing a cover portion that is positioned only at a portion of the one surface of the board mounting portion—the portion including the region in which the circuit board is arranged—and that includes a bottom surface portion and a first side surface portion extending from the bottom surface portion toward the one surface of the board mounting portion, with the first side surface portion including a first opening portion. This construction improves mounting workability when mounting the cover member on the display panel support member.

158. Defendants have directly infringed at least claim 1 of the '877 Patent in this judicial district and elsewhere in Texas, literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the Hisense 50R6E5 television.

159. The Hisense 50R6E5 is a television comprising a display panel, a board mounting portion located behind the display panel, and a circuit board arranged at one (rear) surface of the board mounting portion.






160. The Hisense 50R6E5 includes a cover portion that is positioned only at a portion of the one (rear) surface of the board mounting portion, and which includes the region in which the circuit board is arranged.




161. The cover portion of the Hisense 50R6E5 includes a bottom surface portion and a first side surface portion that extends from the bottom surface portion toward the one (rear) surface of the board mounting portion.




162. The first side surface portion of the Hisense 50R6E5's cover portion includes a first opening portion.




163. The foregoing features and capabilities of the Hisense 50R6E5, and Defendants' description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 1 of the '877 Patent, under 35 U.S.C. § 271(a).

164. On information and belief, Defendants further infringe the '877 Patent through additional products (collectively, "the '877 Accused Products") utilizing the same or reasonably similar structures as described above with respect to the Hisense 50R6E5 television. The '877 Accused Products include, by way of examples, Hisense televisions including for example, 40A45H, 75A7NF, 65A7NF, 55A7NF, 50A7NF, 43A7NF, 100E6QF, 85E6QF, 75E6QF, 65E6QF, 55E6QF, 50E6QF, 43E6QF, 43A4NF, 40A4NF, 32A4NF, 100QD6QF, 85QD6QF, 75QD6QF, 65QD6QF, 55QD6QF, 50QD6QF, 43QD6QF, 75QD65NF, 65QD65NF, 55QD65NF, 50QD65NF, 43QD65NF, 40QD4QF, 43H40G, 32H40G, 98QD5030G, 85QD6030G, 75QD6030G,

70QD6030G, 65QD6030G, 55QD6030G, 50QD6030G, 43QD6030G, 65QD5N, 55QD5N, 50QD5N, 43QD5N, 50H5BG, 100U76N, 32A45K, 100U70N, 100QD7N, 85QD7N, 75QD7N, 65QD7N, 85A6N, 75A6N, 70A6N, 65A6N, 55A6N, 50A6N, 43A6N, 65A65H, 55A65H, 85A7N, 75A7N, 65A7N, 55A7N, 50A7N, 43A7N, 85U6N, 75U6N, 65U6N, 55U6N, 85U7N, 75U7N, 65U7N, 55U7N, 75U75N, 65U75N, 98QD5QG, 58QD50R, 43A4NR, 40A4NR, 32A4NR, 32H4030F3, 85R6E3, 75R6E4, 70R6E4, 65R6E4, 58R6E3, 50R6E3, and 43R6E3. These additional products each include all necessary hardware and work as described above with respect to the exemplary Hisense television, the Hisense 50R6E5. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate the same or reasonably similar structures. For the avoidance of doubt, the ’877 Accused Products are identified to describe the Defendants’ infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar structures.

165. Defendants have indirectly infringed at least claim 1 of the ’877 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the ’877 Accused Products. Defendants’ customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants’ instructions directly infringe at least claim 1 of the ’877 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 50R6E5 located at the following websites: https://www.hisense-usa.com/support/televisions-50-class-r6-series-4k-uhd-roku-tv-50r6e3; https://meidiusa.com/wp-content/uploads/50R6E550A6NR58R6E5.pdf. Defendants are thereby liable for infringement of the ’877 Patent pursuant to 35 U.S.C. § 271(b).

166. Defendants have indirectly infringed at least claim 1 of the ’877 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the ’877 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the ’877 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

167. For example, the ’877 Accused Products include a board mounting portion, a circuit board arranged at one surface thereof, and a cover portion having a bottom surface portion and a first side surface portion with a first opening portion. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the ’877 Patent pursuant to 35 U.S.C. § 271(c).

168. Defendants have been on notice of the ’877 Patent since at least December 24, 2024. By the time of trial, Defendants will thus have known and intended (since receiving such notice), that their continued actions would actively induce and contribute to actual infringement of at least claim 1 of the ’877 Patent.

169. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the ’877 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least December 24, 2024, Defendants have

been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the ’877 Patent, and that the ’877 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the ’877 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants have continued their infringing activities. As such, and based on Defendants’ knowledge of the strength and value of Maxell’s portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the ’877 Patent.

170. Maxell has been damaged by Defendants’ infringement of the ’877 Patent.

**COUNT 6 - INFRINGEMENT OF U.S. PATENT NO. 12,526,466**

171. Maxell incorporates paragraphs 1-170 above by reference.

172. U.S. Patent No. 12,526,466 (the “’466 Patent,” attached hereto at Exhibit 6) duly issued on January 13, 2026 and is entitled *Broadcast Receiver and Broadcast Receiving System*.

173. Maxell is the owner of the ’466 Patent and possesses all rights under the ’466 Patent, including the exclusive right to recover for past and future infringement.

174. The ’466 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

175. The ’466 Patent is directed to a digital broadcast receiver, such as a television, that is capable of executing functions having higher added value by controlling the activation of an

application that operates in cooperation with a broadcast program based on application-related information carried in the broadcast wave. The receiver controls operations including the activation and end of such an application based on the application-related information and, in response to a user's operation, selects control relating to activation or reactivation of the application.

176. The '466 Patent improves upon prior digital broadcast receivers by displaying, when the application-related information indicates that an application is available and the receiver determines that the application is executable, an on-screen activation prompt instructing the user to activate the application by performing a predetermined operation, and then activating the application in response to that user operation, including to display internet video content acquired via a network interface while the receiver is connected to the Internet. This configuration enables the receiver to coordinate broadcast programming and internet-delivered content under user control, providing a broadcast-cooperation service of higher usability than prior systems.

177. Defendants have directly infringed one or more claims of the '466 Patent in this judicial district and elsewhere in Texas, including at least claim 1 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the Hisense 55U75QG television.

178. The Hisense 55U75QG is a broadcast receiving apparatus configured to execute an application. In particular, the Hisense 55U75QG is a television equipped with a combination of hardware and software that include or operate as a broadcast program receiving apparatus configured to execute an application.




(Hisense 55U75QG Product Page, available at [https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg](https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg))

| Model name | 55U75QG | 65U75QG | 75U75QG | 85U75QG | 100U75QG |
|---|---|---|---|---|---|
| **DISPLAY** | | | | | |
| Actual Screen Size (Measured Diagonally) | 54.6" | 64.5" | 74.5" | 84.5" | 99.5" |
| Screen Class | 55" | 65" | 75" | 85" | 100" |
| Screen Type | LCD | | | | |
| Backlight Source Type | Mini-LED Pro | | | | |
| **PICTURE QUALITY** | | | | | |
| Screen Resolution | 4K UHD | | | | |
| QLED-Quantum Dot Color | QLED Color | | | | |
| WCG-Wide Color Gamut | Yes | | | | |
| AI PQ Engine | Hi-View AI Engine Pro | | | | |
| Full Array Local Dimming | Yes | | | | |
| Anti-Glare Low Reflection Panel | Yes | | | | |
| Native Refresh Rate | 165Hz | | | | |
| Motion Rate | 480 | | | | |
| MEMC / Frame Insertion | MEMC /Black Frame Insertion | | | | |
| Aspect Ratio | 16:9 | | | | |
| Film Maker Mode | Yes | | | | |
| IMAX Enhanced | Yes | | | | |
| HDR Formats | Dolby Vision, Dolby Vision IQ, HDR10, HDR 10+, HDR10+ Adaptive, HLG | | | | |
| Film Maker Mode | Yes | | | | |
| IMAX Enhanced | Yes | | | | |
| **SMART TV** | | | | | |
| Smart Platform | Google TV | | | | |
| Google Assistant | Google Assistant Built-in | | | | |
| Google Cast | Supports Google Cast | | | | |
| Alexa | Works With Alexa | | | | |
| Apple Home Kit | Works with Apple HomeKit / Airplay | | | | |
| Far Field Mic/Hands Free | Yes | | | | |
| **GAMING** | | | | | |
| Game Mode | 165Hz Game Mode Ultra | | | | |
| VRR/ALLM | Yes | | | | |
| Game Bar | Enhanced | | | | |
| Game Booster | 288 VRR | | | | |
| AMD Freesync | Freesync Premium Pro | | | | |
| Nvidia Gsync Compatible | Yes | | | | |
| HDR Gaming | Dolby Vision Gaming, HDR10+ Gaming | | | | |
| **AUDIO** | | | | | |
| Audio Output Power (Watts) | 50W | 50W | 50W | 60W | 60W |
| Multi-Channel Audio | 2.1.2 | | | | |
| Audio Enhacement | Dolby Atmos | | | | |
| Soundsend Certified | Yes | | | | |
| **LANGUAGES** | | | | | |
| On-screen Display | English, French, Spanish | | | | |
| **POWER** | | | | | |
| Power Consumption | 200W | 300W | 310W | 400W | 500W |
| Standby Consumption | ≤0.5W | ≤0.5W | ≤0.5W | ≤0.5W | ≤0.5W |
| **CONNECTIVITY** | | | | | |
| Wi-Fi Built In | Wifi 6E | | | | |
| Bluetooth | Yes (5.3) | | | | |
| **PORTS** | | | | | |
| HDMI | 4 x HDMI 2.1 | | | | |
| HDMI-CEC, HDMI-ARC | Yes (HDMI-3 eARC) | | | | |
| Ethernet (LAN) | Yes | | | | |
| USB Input | Yes (1 x 3.0, 1 x 2.0) | | | | |
| RF Antenna Type | NTSC/Clear QAM/ATSC 3.0 (NextGen TV) | | | | |
| RCA Composite Video Input | Yes (Mini Jack) | | | | |
| L/R Audio Input for Composite | Yes | | | | |
| Digital Audio Output | Optical | | | | |
| Earphone / Audio Output | Yes | | | | |

(Hisense 55U75QG – Specification Sheet, available at https://www.hisense-usa.com/_files/ugd/991681_13aec4e82346429e96aadc444c0d90de.pdf)

179. The Hisense 55U75QG includes a broadcast receiver configured to receive a broadcast wave including a digital broadcast program and application-related information. The Hisense 55U75QG includes multiple connectivity hardware and capabilities for receiving a broadcast wave including a digital broadcast program and application related information, and displaying video images. For example, the Hisense 55U75QG includes wired and wireless connectivity capabilities and hardware for digital broadcast programs, such as an radio frequency (RF) antenna and the like. The Hisense 55U75QG is further configured to be connected to external communication devices to facilitate receiving a broadcast wave including a digital broadcast program and application related information, including via ATSC 3.0.

**Ports**

| | | | |
|---|---|---|---|
| HDMI | Ethernet (LAN) | USB | RF antenna |
| 4 x HDMI 2.1 | Yes | Yes (1 x 3.0, 1 x 2.0) | NTSC/Clear QAM/ATSC 3.0 (NextGen TV) |
| RCA composite video input | L/R audio input for composite | Digital audio output | Earphone/audio output |
| Yes (Mini Jack) | Yes | Optical | Yes |

(Hisense 55U75QG - Product Page Specifications available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

**Connectivity Options**

| | |
|---|---|
| HDMI ( 2.1 ) | 4 |
| USB ( 3.0 + 2.0 ) | 2 ( USB 3.0 X 1, USB 2.0 X 1 ) |
| Ethernet / LAN | Yes |
| Bluetooth™ 5.3 | Yes |
| Built-In Bluetooth | Yes |
| Earphone, Audio Output | Yes |
| L / R Audio Input For Composite | Yes |
| Digital Audio Output | Optical |
| Wi-Fi Built In | Wifi 6E |
| RCA Composite Video Input | Mini Jack |
| HDMI-CEC, HDMI-ARC | HDMI-3 eARC |
| RF Antenna | NTSC, Clear QAM, ATSC 3.0 ( NextGen TV ) |

(Hisense 55U75QG - Specifications, available at https://mail.fullspecs.net/compare/hisense-55u75qg-vs-hisense-55u68qg/)



(Photo of ports of Hisense 55U75QG, including RF antenna ports)




(Digital antenna for Hisense 55U75QG to facilitate receiving ATSC 3.0 signals)

180. The Hisense 55U75QG includes a decoder configured to decode video image information of a broadcast program received by the broadcast receiver and a network interface configured to perform communication via the Internet. In addition to the decoder and network interface, the Hisense 55U75QG also includes a display to display at least one of a video image of the broadcast program decoded by the decoder and an execution video image of the application executed by a processor, such as the Hisense 55U75QG's Hi-View Engine Pro chipset / processor, a MediaTek Pentonic 800 (MT9655) System-On-Chip ("SOC"), an ARM Cortex-A73 CPU, and an ARM Mali-G57 MC1 GPU, and related software to operate its communications hardware, apps, and various sensors.


Antenna
Antenna
4.1 WRC-HD
News4 at 4 pm
4.1 WRC
4.2 COZI
Married ... with Children
4.3 CRIMES
Unsolved Mysteries
4.4 Oxygen
Dateline: Unforgettable
5.1 WTTG
7.1 WJLA
Press "OK" to enter the channel list
FAV
History
Edit
STAY TUNED: TRACKING HE


WSOC
abc7 NEWS ON YOUR SIDE
Press RIGHT to begin your experience
GMA
TOP 3
RELENTLESS RAIN POUNDING MID-ATLANTIC
1:02 80°
GMA

## Network

Supported network technologies and standards for exchanging data with other devices.

| | |
|---|---|
| **Network**<br>Information about the network technologies and standards supported by the model, which allow for it to connect to and communicate with other devices. | ▸ LAN<br>▸ Wi-Fi<br>▸ 802.11a (IEEE 802.11a-1999)<br>▸ 802.11b (IEEE 802.11b-1999)<br>▸ 802.11g (IEEE 802.11g-2003)<br>▸ 802.11n (IEEE 802.11n-2009)<br>▸ 802.11n 5GHz<br>▸ 802.11ac (IEEE 802.11ac)<br>▸ 802.11ax (IEEE 802.11ax, Wi-Fi 6)<br>▸ Wi-Fi Direct<br>▸ DLNA<br>▸ Bluetooth 5.3<br>▸ Anyview Cast |

## Connectivity

Available connectivity ports, slots and interfaces.

| | |
|---|---|
| **Connectivity**<br>Information about the available connectivity ports, slots and interfaces such as USB, infrared port, SD card slot, audio/video and network interfaces, etc. | ▸ 1 x USB 2.0 (Type-A; downstream)<br>▸ 1 x USB 3.0 (Type-A; downstream)<br>▸ 1 x Ethernet RJ45<br>▸ 4 x HDMI 2.1<br>▸ 1 x Cable/Antenna In (F-type female)<br>▸ 1 x AV Composite In 3.5 mm jack<br>▸ 1 x Optical Audio Out<br>▸ 1 x 3.5 mm Audio Out |
| | ▸ Auto Low Latency Mode (ALLM)<br>▸ Enhanced Audio Return Channel (eARC) on HDMI 3<br>▸ High-bandwidth Digital Content Protection (HDCP)<br>▸ High Frame Rate (HFR)<br>▸ Variable Refresh Rate (VRR) |

(Hisense 55U75QG – Specifications available at https://www.displayspecifications.com/en/model/25104155)

## TV tuner

The TV tuner is a device, which allows the receiving and visualization of a certain type of television signal. There are tuners for digital, analog, cable and satellite television.

| | |
|---|---|
| **TV tuner**<br>Information about the TV tuners, which the current model is equipped with. | ▸ Analog (NTSC/PAL/SECAM)<br>▸ ATSC<br>▸ Clear QAM<br>▸ ATSC 3.0 |

(Hisense 55U75QG – Specifications available at https://www.displayspecifications.com/en/model/25104155)







**AI expert behind every frame**

Hi-View Engine Pro

Enjoy the sports game from home, but feel like you're there. Powered by the Hisense proprietary chipset, Hi-View AI Engine Pro automatically optimizes the picture and sound based on the content you are watching. This intelligent feature detects, analyzes and adjusts the details, depth and appearance of everything you watch or play, making every visual even more realistic.

(Hisense 55U75QG Product Page, available at https://www.hisense-usa.com/product-page/televisions-55-class-u7-series-miniled-uled-4k-google-tv-55u75qg)

181. The processor of the Hisense 55U75QG is configured to cause the display to display, in a case where the application-related information includes information regarding activation of the application and when the processor determines that the application is executable, an activation prompt instructing a user to activate the application by performing a predetermined

operation. The processor of the Hisense 55U75QG, or portion thereof, can determine whether an application is executable and cause the display to display an application activation prompt.




(Photo of Hisense 55U75QG showing activation prompt for digital broadcast content)




(Photo of Hisense 55U75QG showing application executed based on selection of right arrow on remote control per activation prompt)

182. The processor of the Hisense 55U75QG is further configured to control the application such that the application is activated in response to the predetermined operation performed by the user, and execute the application that performs an operation that displays internet video content acquired via the network interface while the network interface is connected to the Internet.




(Photo of Hisense 55U75QG showing executed application)



(Photo of Hisense 55U75QG showing "OnDemand" content as thumbnails of internet video content)




(Photo of Hisense 55U75QG displaying one of the selected internet video content)




183. The foregoing features and capabilities of the Hisense 55U75QG, and Defendants' description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 1 of the '466 Patent, under 35 U.S.C. § 271(a).

184. On information and belief, Defendants further infringe the '466 Patent through additional products (collectively, "the '466 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the Hisense 55U75QG television. The '466 Accused Products include, by way of examples, Hisense televisions including for example, 100UR9SG, 85UR9SG, 75UR9SG, 65UR9SG, 100UR8SG, 85UR8SG, 75UR8SG, 65UR8SG, 55UR8SG, 116U7SG, 100U7SG, 85U7SG, 75U7SG, 65U7SG, 55U7SG, 100U76N, 110UX, 116UX, 100UX, 98UX, 100U70N, 116U75QG, 100U75QG, 85U75QG, 75U75QG, 65U75QG,

55U75QG, 100U8QG, 85U8QG, 75U8QG, 65U8QG, 55U8QG, 85U7N, 75U7N, 65U7N, 55U7N, 85U8N, 75U8N, 65U8N, 55U8N, 75U75N, and 65U75N. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary Hisense television, the Hisense 55U75QG. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '466 Accused Products are identified to describe the Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

185. Defendants have indirectly infringed at least claim 1 of the '466 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '466 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe at least claim 1 of the '466 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides, such as those for the Hisense 55U75QG located at the following website: https://file-dl.intsmarthub.com/h5emanual/2026/03/9655GTV%20E-Manual%20AM%20eng%2020260228_19cbc04ee5f/index.html. Defendants are thereby liable for infringement of the '466 Patent pursuant to 35 U.S.C. § 271(b).

186. Defendants have indirectly infringed at least claim 1 of the '466 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '466 Accused Products by making,

offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the ’466 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

187. Defendants have been on notice of the ’466 Patent since at least the filing of this complaint. By the time of trial, Defendants will thus have known and intended (since receiving such notice), that their continued actions would actively induce and contribute to actual infringement of at least claim 1 of the ’466 Patent.

188. Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the ’466 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this complaint, Defendants have been aware of an objectively high likelihood that their actions constituted and continue to constitute infringement of the ’466 Patent, and that the ’466 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the ’466 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants have continued their infringing activities. As such, and based on Defendants’ knowledge of the strength and value of Maxell’s portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendants willfully infringe the ’466 Patent.

189. Maxell has been damaged by Defendants’ infringement of the ’466 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Maxell prays for relief as follows:

190. A judgment declaring that Hisense has infringed and is infringing one or more claims of ’007, ’508, ’507, ’270, ’877, and ’466 Patents;

191. A judgment awarding Maxell compensatory damages as a result of Hisense’s infringement of one or more claims of the ’007, ’508, ’507, ’270, ’877, and ’466 Patents, together with interest and costs, consistent with lost profits and in no event less than a reasonable royalty;

192. A judgment awarding Maxell treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Hisense’s willful and deliberate infringement of one or more claims of the ’007, ’508, ’507, ’270, ’877, and ’466 Patents;

193. A judgment declaring that this case is exceptional and awarding Maxell its expenses, costs, and attorneys’ fees in accordance with 35 U.S.C. § 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

194. A grant of preliminary and permanent injunctions enjoining Defendant from further acts of infringement of one or more claims of the ’007, ’508, ’507, ’270, ’877, and ’466 Patents; and

195. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Maxell hereby demands a trial by jury.

Dated: August 7, 2026 By: *_/s/ Geoffrey Culbertson_*

Geoff Culbertson
Kelly Tidwell
Patton, Tidwell & Culbertson, LLP
2800 Texas Boulevard (75503)
Post Office Box 5398
Texarkana, TX 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
gpc@texarkanalaw.com
kbt@texarkanalaw.com

Kfir B. Levy
Jamie B. Beaber
Alan M. Grimaldi
Tatsuya Koyama
Alison T. Gelsleichter
Julia Haines
Matthew Stanford
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
klevy@mayerbrown.com
jbeaber@mayerbrown.com
agrimaldi@mayerbrown.com
Tatsuya.koyama@mayerbrown.com
agelsleichter@mayerbrown.com
jhaines@mayerbrown.com
mstanford@mayerbrown.com

Amanda S. Bonner
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
asbonner@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*